# In the United States Court of Federal Claims

No. 14-497C
(E-Filed:  May 29, 2015)

| | |
|---|---|
| JOSE MENDEZ, | Confidential Informant; Compensation, Restitution, or Reward; Judicial Forfeitures; Breach of Express or Implied-In-Fact Contract; Express or Implied Actual Authority; Subject-Matter Jurisdiction; Statute of Limitations; RCFC 12(b)(1); RCFC 12(d) Conversion of RCFC 12(b)(6) Motion to RCFC 56 Motion |

JOSE MENDEZ,

   Plaintiff,

v.

THE UNITED STATES,

   Defendant.

Confidential Informant; Compensation, Restitution, or Reward; Judicial Forfeitures; Breach of Express or Implied-In-Fact Contract; Express or Implied Actual Authority; Subject-Matter Jurisdiction; Statute of Limitations; RCFC 12(b)(1); RCFC 12(d) Conversion of RCFC 12(b)(6) Motion to RCFC 56 Motion

<u>Kenneth Foard McCallion</u>, New York, N.Y., for plaintiff.

<u>Alexander Orlando Canizares</u>, Trial Attorney, with whom were <u>Joyce R. Branda</u>, Acting Assistant Attorney General, <u>Robert E. Kirschman, Jr.</u>, Director, and <u>Bryant G. Snee</u>, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

CAMPBELL-SMITH, Chief Judge

  Plaintiff Jose Mendez (Mendez) was a confidential informant whose assistance and cooperation, over roughly nine years, contributed to the government's successful criminal prosecution of numerous mafia principals and subsequent forfeiture of their significant assets. <u>See generally</u> Compl., Jun. 10, 2014, ECF No. 1.  Mendez alleges that, despite his contributions, the government later reneged on its promises to pay Mendez for his services as an informant, which was in breach of their alleged agreement and of the implied duty of good faith and fair dealing. <u>Id.</u> ¶¶ 29–37 (Counts II and III).

  Before the court is defendant's motion to dismiss plaintiff's breach claims for lack of jurisdiction or alternatively, for failure to state a claim under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims (RCFC or Rule), respectively. Def.'s Mot. Dismiss (Def.'s Mot.), ECF No. 12.  Defendant argues there were never any promises or agreements to pay Mendez for his confidential informant services and the evidence on which Mendez relies to substantiate his claims actually refutes them. <u>Id.</u> at

3.  Alternatively, even if government officials made promises or purported to enter agreements with Mendez, defendant contends that the government cannot be liable because the officials either lacked actual authority to bind the government or were divested of such authority by intervening statutes. Id. at 3, 22–23.  Furthermore, plaintiff's claims allegedly accrued, if at all, beyond the statute of limitations. Id. at 3. The court held oral argument on defendant's motion on April 8, 2015.  See Tr., Apr. 8, 2015, ECF No. 24.

I.      Background[1]

        From December 1995 through April 1997, plaintiff Jose Mendez managed a casino in Peru pursuant to a professional services contract with casino principals Jose Miguel Battle Sr. (Battle) and others.  See Compl. ¶ 4; id. at Ex. B (Mendez Aff., Mar. 28, 2007, ¶ 1).  In May 1997, Mendez sued his employers in Florida Circuit Court for nonpayment of back wages, expenses, and commissions ($794,712), but the case was dismissed for improper venue owing to a contract clause requiring suit in Peru.  See Compl. ¶¶ 4, 6; Mendez Aff. ¶ 7.

        In preparing Mendez's employment case, his attorney John Spittler (Attorney Spittler) concluded, "Battle and his associates were using the Casino to facilitate a huge racketeering and money laundering operation, which involved the 'laundering' of illegally obtained funds originating in the United States." Compl. ¶ 5; see also Mendez Aff. ¶ 3 (detailing Mendez's own misgivings about the casino's principals, their illegal activities, and consequences).  Attorney Spittler then communicated with representatives of the United States government who expressed interest in seeing "all of the original accounting, financial and international banking records of the Casino and its owners that were in the possession of Mendez."  Compl. ¶ 7; Mendez Aff. ¶ 13.  Apparently the government was already investigating Battle as the "undisputed leader of La Corporacion, the largest Cuban organized crime syndicate in the United States [that for decades] had profited from illegal gambling, narcotics distribution[,] and extortion, enforcing its objectives through contract murder."  See Compl. at Ex. J (O'Bannon Mem., Apr. 6, 2005, at 1); see also id. ¶ 25 (identifying Exhibit J as a report authored by Supervisory Special Agent (SSA) O'Bannon); Tr. 12:8–16 (similar).

        By "late April of 1998," Mendez began acting as an "agent/informant in the investigation and prosecution of members of the . . . cartel headed by Battle."  Compl. ¶ 8.  Mendez contends that he provided the government with significantly helpful information:  (i) "original books and records of the Casino, all original bank financial documents, and other relevant files;" (ii) "the names, addresses, and telephone numbers

---

[1]     The facts recited in this section do not constitute findings by the court; rather, unless otherwise noted, all of the stated facts are either undisputed or alleged and assumed to be true for purpose of the pending motions.

of the individuals working with Battle in his racketeering enterprise . . ., e.g., attorneys, accountants, bankers, businessmen, couriers, etc., many of whom were later named in the indictment;" (iii) "evidence relating to the participation of Battle and his 'partners' in the racketeering enterprise;" (iv) "detailed information concerning the properties and bank accounts of these individuals;" and (v) "the identification of corroborating witnesses." Id. ¶¶ 14–15; see generally id. at Ex. D (Spittler Narrative, Jun. 8, 2005, at 3); O'Bannon Mem. 2; Mendez Aff. ¶ 9; Tr. 28:8–16. Mendez avers that, at the government's request, he worked with government accountants to unpack the illegal financial activities of Battle and his associates. Mendez Aff. ¶ 20. Mendez also purports to have "provided all, or virtually all, of the information" used by the government to identify and tally an estimated $1.57 billion in assets held by Battle and his associates that were later subject to criminal forfeiture by the government. Compl. ¶ 17; Spittler Narrative 3; see infra Part I.D (discussing United States v. Battle, No. 04-20159 (S.D. Fla.)).

In order to provide this wealth of information and services, Mendez and Attorney Spittler allegedly met with various government officials on numerous occasions over the course of approximately nine years, from 1998 to 2007. See Mendez Aff. ¶¶ 10–11; Tr. 28:21–24. Mendez's primary point-of-contact appears to have been Agent Dave Shanks. See Compl. ¶ 15; Mendez Aff. ¶ 10. Among others in contact with Mendez and Attorney Spittler were Supervisory Special Agent (SSA) Robert O'Bannon of the Diplomatic Security Service (DSS) at the State Department who led the Battle investigative team, and who was succeeded later by Special Agent in Charge (SAC) Mike Foster. Id. ¶¶ 18–19. Assistant U.S. Attorney (AUSA) Robert Lehner was the initial lead prosecutor in Battle, and was succeeded later by AUSA Tony Gonzalez. Compl. ¶ 19. AUSA Alison Lehr of the Miami Civil Forfeiture Division also became involved in Battle as the criminal forfeitures took center stage later in proceedings. Id. ¶ 21.

Mendez testified in June 2002 before a grand jury in Miami regarding Battle, his associates, and their activities. Mendez Aff. ¶ 12. Mendez further contends that, throughout these nine years, his life and the lives of his family members remained under physical threat from Battle and his associates. See Tr. 28:21–24.

A.      Disputed 1998 "Restitution/Compensation Agreement"

In dispute is whether Mendez and government officials ever entered an agreement to compensate Mendez for his assistance as a confidential informant (CI). Mendez avers that, on his behalf, Attorney Spittler met with AUSA Lehner in early 1998 at the Miami office of the United States Attorney. Compl. ¶ 9. Also in attendance were representatives of "other relevant agencies." Tr. 32:6; O'Bannon Mem. 1. At the meeting, Mendez alleges that the parties verbally agreed that "[i]n consideration for Mendez's cooperation, services and assistance, . . . Mendez would be paid, as compensation and/or restitution, the outstanding salary and commissions owed him as general manager of the Casino, namely $791,712, plus accrued interest, reasonable fees and costs." Compl. ¶¶ 8–9; cf. O'Bannon Mem. 1 ("Government representatives

unanimously agreed to fully assist the CI in his efforts to recoup the referenced financial losses . . . ."). Ostensibly, Mendez would be paid out of assets seized by the government in the course of its criminal prosecution of Battle and his associates for racketeering and money laundering. See Compl. ¶ 19; see O'Bannon Mem. 1.

The terms of this verbal agreement allegedly were "memorializ[ed]" in a letter from Attorney Spittler to AUSA Lehner dated March 18, 1998. Compl. ¶ 9. Attorney Spittler wrote, in relevant part:

> Regarding our discussion in your office it will be necessary to have an agreement(s) entered into between Mr. Mendez and the appropriate United States government official(s) with the authority to bind the government (e.g. yourself, the AUSA handling the forfeiture case, an assistant at the Attorney General's office regarding rewards pursuant to 18 USC 3059, etc.).
>
> The agreement(s) should include that Mr. Mendez will be entitled to restitution prior to the government receiving any fine, penalty, or other monies and same stipulation will be included in all court documents . . . .
>
> It is anticipated that restitution/reward to [Mendez] will come from [the criminal forfeiture of Battle's] ranch and its contents . . . in Homestead, Florida[]. The amount of restitution will be the damages requested in [Mendez's employment lawsuit] which [was] approximately $791,712.00 + legal interests from January 1, 1996 + reasonable attorneys['] fees + punitive damages.

Id. at Ex. A (Spittler Letter, Mar. 18, 1998). The letter further provided, "in consideration for the above," Mendez would provide documentation, testify before a grand jury, and comply with other requests. Id. Attorney Spittler asked AUSA Lehner to call him "regarding drafting of the appropriate agreement(s) and scheduling Mr. Mendez for debriefing." Id. at 2.

According to Mendez, the government refused this invitation to reduce the verbal agreement to a formal writing signed by the parties. See Compl. ¶ 11. Mendez avers, "[a]fter receiving the March 18th letter, AUSA Lehner advised [Attorney] Spittler that the verbal agreement with Mendez could not be reduced to writing" for "Mendez's own protection." Id. In "the absence of any formal written agreement[,]" Mendez contends he was told, "there would be no written document that would have to be divulged to any of the defendants' attorneys, who would 'blow his cover.'" Id. In addition, because "there was ample evidence that Battle [allegedly] had murdered numerous persons, both within his own drug trafficking network as well as some individuals outside of it[,] . . . Mendez and his family would be in mortal danger" if Battle became aware that Mendez

was cooperating with the government.  Id. ¶ 12; see also Tr. 32:11–25.[2]  Nevertheless, AUSA Lehner purportedly "gave repeated assurances that the verbal agreement with Mendez was 'as good as gold' and would be honored by the government."  Compl. ¶ 13.

B.     Disputed 2002 Amendment

Mendez further avers that by "May of 2002, Attorney Spittler was advised by Agent Shanks that AUSA Gonzalez wanted to modify the original restitution/compensation agreement between Mendez and the government."  Id. ¶ 20.  In turn, Mendez contends that Attorney Spittler and SSA O'Bannon reached a verbal agreement on modification.  Id.  Attorney Spittler then purportedly memorialized the modification in a facsimile transmitted to SSA O'Bannon, dated June 3, 2002.  Id.  That communication refers to an "original agreement between Joe Mendez, agent Shanks, AUSA Bob Lehner, [SSA O'Bannon] and [Attorney Spittler]."  Id. at Ex. E (Spittler Facsimile, June 3, 2002).  The two "[a]dditions" to the 1998 "[a]greement" allegedly "agreed to" by the parties were:  (1) "the moneys owed to Mr. Mendez for restitution from the forfeited properties [would] be paid directly to [an escrow account set up by Attorney Spittler];" and (2) "in lieu of direct payment to [the escrow account] from the first moneys/assets forfeited, . . . Mendez [agreed to forego filing any] liens on Battle [or his co-defendants'] properties/assets prior to government seizure in the criminal case."  Id.

On September 25, 2002, Attorney Spittler asked AUSA Lehr, of the Civil Forfeiture Division-Miami, when the government would pay Mendez from the forfeitures of Battle's assets.  Compl. ¶ 21.  "In response, AUSA Lehr requested that Attorney Spittler send her evidence of the Agreement, which Attorney Spittler did the next day, and again the following month."  Id.; see also id. at Ex. F (Spittler Facsimiles, Sept. 26, 2002 & Oct. 1, 2002) & Ex. G (Spittler Facsimile, Sept. 27, 2002).  Neither AUSA Lehr nor anyone else from the government appears to have responded to any of the facsimiles.  See Compl. ¶¶ 21–22.

In March 2004, Attorney Spittler's co-counsel, Karen Read (Attorney Read), spoke with AUSA Lehr regarding Mendez and another of Attorney Read's clients named Harold Marchena (who it appears was also a witness or informant in Battle).  See id. ¶ 23.  In a subsequent facsimile, Attorney Read followed up, referring to the "restitution agreements between the United States government" and Mendez and Marchena, and notifying AUSA Lehr that her office was "prepared to file an equitable lien for both Mr. Mendez and Mr. Marchena on various properties over which [AUSA Lehr and the

---

[2]     "Indeed, when Battle eventually became aware that Mendez was cooperating with the government," Mendez avers that "[he] and the other members of his family were forced into hiding, and they presently remain in seclusion."  Compl., Jun. 10, 2014, ECF No. 1, ¶ 12.

government generally] . . . have [current] responsibility." Id. at Ex. H (Read Facsimile, Mar. 29, 2004, at 1).

C.    Disputed Other Promises/Agreements

Sometime in 1998 or thereafter, Mendez alleges that he also "became an official confidential informant ('CI') with the U.S. Department of State, DSS." Compl. ¶ 18. Mendez further avers that "SAC Foster [of DSS] had a verbal agreement with the Department of State senior staff recommending that Mendez, as its CI, be paid $2 million or 20% of all amounts recovered, whichever was greater [(the DSS Compensation Promise)]." Id. ¶ 19. "SAC Foster also [allegedly] told Spittler that DSS would make a recommendation to the [Department of Justice (DOJ)] and the IRS that they also pay Mendez in a similar manner, i.e., 20% of all amounts recovered." Id. It is unclear from Mendez's complaint whether Mendez relies upon these DSS, DOJ, and IRS-related promises as separate and distinct agreements on which he sues for breach, or whether these alleged promises were the means for carrying out the 1998 agreement.

D.    The Battle Case—Criminals Prosecutions & Asset Forfeiture

By early 2004, the government indicted Battle and approximately twenty-four associates for illegal gambling in violation of 18 U.S.C. § 1955 and racketeering conspiracy in violation of 18 U.S.C. § 1962(d). See Def.'s Mot. 7 & Ex. 1 (Indictment 11–12, 16–17, Battle (Mar. 16, 2004)); see also Compl. ¶ 8 (citing Battle). The indictment also provided for forfeiture of all property constituting or derived from a violation of 18 U.S.C. § 1955, which was estimated to be worth at least $1.57 billion. Indictment at 17–32; see also Def.'s Mot. 7; Compl. ¶ 16.

Thereafter, the Battle court entered a series of orders of criminal forfeiture in March 2006, December 2006, January 2007, and January 2010, against Battle and his co-defendants, directing the forfeiture to the United States of property connected to the criminal violations. Def.'s Mot. 7 & Ex. 2 (Forfeiture Orders, Battle). In turn, on July 5, 2006, Battle and his co-defendants were found guilty by a jury of the RICO conspiracy charged in the indictment. Def.'s Mot. 7 & Ex. 3 (Special Verdict Form, Battle (Jul. 25, 2006)) (detailing the jury's finding that the property listed therein was subject to forfeiture because it was "obtained directly or indirectly [from Battle and his co-defendants'] racketeering activity").

E.    Mendez's Efforts to Collect

Following the criminal convictions, on February 27, 2007, Mendez filed in the Battle case for an equitable lien against the assets to be forfeited, seeking to recover the funds allegedly promised Mendez pursuant to the alleged 1998 verbal Restitution/Compensation Agreement. See Compl. at Ex. C (Notice of Lien & Mem. of Law (Notice of Lien), Battle (Apr. 4, 2007)); see also Compl. ¶ 14; Def.'s Mot. 7–8

(discussing same).  On April 5, 2007, the government responded to the Notice of Lien with a motion to strike, arguing that Mendez failed to meet the prerequisites for lienholder status under the RICO statute, 18 U.S.C. § 1963.  Def.'s Mot. 8 & Ex. 4 (Mot. Strike Claims of Harold Marchena & Jose Mendez, <u>Battle</u> (Apr. 5, 2007)).  On March 3, 2008, a United States Magistrate Judge granted the government's motion, finding in relevant part that Mendez failed to establish the requisite legal right, title, or interest in any specific property subject to forfeiture under 18 U.S.C. § 1963(*l*)(6).  <u>Id.</u> at Ex. 5 (Magistrate Order, <u>Battle</u> (Mar. 3, 2008)) & Ex. 6 (Order, <u>Battle</u> (Nov. 21, 2008) (substantially affirming Magistrate)).

Mendez also separately tried to obtain money judgments in Florida Circuit Court against two of Battle's associates and fellow principals in the casino.  <u>See</u> Compl. ¶ 24.  Mendez was successful obtaining those judgments, dated July 1, 2008 and August 8, 2008, in the amounts of $791,712.00, plus prejudgment interest, <u>id.</u> at Ex. I (Final Judgments, <u>Mendez v. Marquez</u>, No. 08-21101-CA-10 (Fla. Cir. Ct.)); however, there is no evidence Mendez has ever been able to collect.

Lastly, in June 2012, Mendez sought unsuccessfully to obtain Department of Justice approval to receive compensation for his informant services.  Def.'s Mot. 8.  In Mendez's petition for remission to the DOJ's Asset Forfeiture and Money Laundering Section (AFMLS), he argued that he qualified as a "victim" of offenses committed by Battle and his co-defendants and was owed compensation.  Def.'s Mot. 8–9; <u>id.</u> at Ex. 7 (Petition for Remission, undated, with exhibits).  On May 8, 2013, the AFMLS denied Mendez's petition because he was neither a "victim" of the crime underlying the forfeiture nor a valid lienholder entitled to remission.  Def.'s Mot. at Ex. 8 (DOJ Letter 1).  He was not a "victim" because there was an insufficient link "between the alleged unpaid employment wages and the racketeering charges underlying the forfeiture."  Id. at 1 (citing 28 C.F.R. § 9.8(a) (2012), defining "victim").  Nor was he a valid lienholder because he became a judgment creditor (based the 2008 Florida Circuit Court judgments) only after the seizure of the property for forfeiture.  Id. at 1–2 (citing 28 C.F.R. § 9.6(f)(1) (2012), stating that a judgment creditor will be recognized as a lienholder only if the judgment was recorded before the seizure of the property for forfeiture).

According to Mendez, at some undefined date, AUSA Lehr also denied the existence of any agreement obligating the government to pay Mendez for his services as an informant.  Compl. ¶ 26.  To date, Mendez has not received any compensation or restitution from the government.  Id.

II.     Procedural Posture

Mendez's complaint seeks compensation or restitution for the information and services he provided to the government in connection with the <u>Battle</u> case "in an amount of not less than that promised under the Agreements, namely, a minimum of . . . ($791,712), plus interest, reasonable attorneys' fees and costs, the exact amount to be

determined at a hearing on the matter, plus any statutory awards this Court deems fair and just." Id. at 11–12 ("wherefore" clause).  His allegations originally took the form of seven counts, id. ¶¶ 27–50, although Mendez has since agreed to dismiss, voluntarily and without prejudice, Count I (declaratory judgment) and Counts IV through VII (unjust enrichment, promissory estoppel, equitable lien, and fraud), Pl.'s Mem. in Opp'n (Pl.'s Opp'n), ECF No. 18, at 2 n.1.  This leaves for adjudication only Counts II and III, alleging breach of express or implied-in-fact contract and breach of the implied duty of good faith and fair dealing.

Defendant moves to dismiss these counts on Rule 12(b)(1) and 12(b)(6) grounds. See generally Def.'s Mot.  The government argues that subject-matter jurisdiction is lacking over Mendez's express and implied breach of contract claims, as well as his implied covenant of good faith and fair dealing claim, because (i) the evidence relied upon by Mendez belies the existence of any mutuality of intent to be bound or to contract; (ii) the agents with whom Mendez dealt lacked authority to bind the government; and (iii) Mendez's claims accrued, if at all, more than six years ago and thus are outside the statute of limitations.  Id. at 2–3, 19.  Alternatively, if jurisdiction exists, then for these same reasons the alleged breaches fail to state a claim upon which this court could grant relief.  Id. at 11.

III.    Subject-Matter Jurisdiction

A.    Express or Implied-in-Fact Contract

The Tucker Act vests this court with jurisdiction to hear claims against the United States founded on an "express or implied contract."  28 U.S.C. § 1491(a)(1) (2012); Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1324 (Fed. Cir. 1997).  For purposes of Tucker Act jurisdiction, alleged contracts enjoy a presumption that money damages are available for breach.  Holmes v. United States, 657 F.3d 1303, 1314 (Fed. Cir. 2011). "[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the government . . . ."  Trauma Serv. Grp., 104 F.3d at 1326.  Thus, the alleged express or implied contract may be oral or written. See Warr v. United States, 46 Fed. Cl. 343, 350 (2000) (exercising jurisdiction over alleged oral agreement).  If the alleged contract is implied, it must be implied-in-fact; the court's jurisdiction does not encompass contracts implied-in-law.[3]  Hercules, Inc. v.

---

[3]    "An implied-in-fact contract is one founded upon a meeting of minds and 'is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'"  Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (quoting Balt. & Ohio R.R. v. United States, 261 U.S. 592, 597, 43 S. Ct. 425, 426–27 (1923)); Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (quoting Hercules, Inc. v. United States, 516 U.S. 417, 423, 116 S. Ct. 981, 986 (1995)).  In contrast, contracts based on implied-in-law theory (i.e., a quasi-contract or unjust enrichment theory) do not arise from mutual assent between the parties and,

United States, 516 U.S. 417, 423–24, 116 S. Ct. 981, 986 (1996); see Hanlin v. United States, 214 F.3d 1319, 1321 (Fed. Cir. 2000); City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990); U.S. Home Corp. v. United States, 92 Fed. Cl. 401, 410-11 (2010).

To survive a Rule 12(b)(1) challenge to jurisdiction, the Federal Circuit has held unambiguously that "jurisdiction . . . requires no more than a non-frivolous allegation of a contract with the government." Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (citing, e.g., Lewis v. United States, 70 F.3d 597, 602, 604 (Fed. Cir. 1995)); see also Hanlin, 214 F.3d at 1321 (explaining that a non-frivolous allegation of the existence of an implied-in-fact contract is sufficient to confer jurisdiction unless another statute divests the court of jurisdiction). Thus, a plaintiff merely "must show that either an express or implied-in-fact contract underlies its claim."[4] Trauma Serv. Grp., 104 F.3d at 1325 (Fed. Cir. 1997) ("A well-pleaded allegation [of express or implied-in-fact contract] in the complaint is sufficient to overcome challenges to jurisdiction." (citing Spruill v. Merit Sys. Protection Bd., 978 F.2d 679, 686 (Fed. Cir. 1992))); see also U.S. Home Corp., 92 Fed. Cl. at 411 (explaining that "[a] non-frivolous jurisdictional allegation is one that asserts that the plaintiffs are 'within the class of plaintiffs entitled to recover under the money-mandating source'" (quoting Jan's Helicopter Serv., Inc. v. FAA, 525 F.3d 1299, 1309 (Fed. Cir. 2008))). Thus, "[w]hen this court hears such a jurisdictional challenge, 'its task is necessarily a limited one.'" Patton v. United States, 64 Fed. Cl. 768, 773 (2005) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183, 104 S. Ct. 3012 (1984)). The relevant issue in a motion to dismiss under Rule 12(b)(1) "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" Id. (quoting same).

---

therefore, are not actually contracts but rather legal fictions created by the courts to impose legal duties on one or both parties to prevent injustice. Lumbermens Mut. Cas. Co. v. United States, 654 F.3d 1305, 1316 (Fed. Cir. 2011); see also City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (citing Hercules, 516 U.S. at 423, 116 S. Ct. at 986); Merritt v. United States, 267 U.S. 338, 340–41, 45 S. Ct. 278, 279 (1925); Russell Corp. v. United States, 537 F.2d 474, 482 (Ct. Cl. 1976)).

[4]      "Non-frivolousness" for purposes of jurisdiction is not well-defined in case law. By way of comparison, "frivolous claims" for which it is not "in the interest of justice" to transfer to another forum under the transfer statute, 28 U.S.C. § 1631, are claims that "include spurious and specious arguments and distortion and disregard of the record[,] . . . involve legal [conclusions] not arguable on the merits, . . . or [are claims] whose disposition is obvious." Galloway Farms, Inc. v. United States, 834 F.2d 998, 1000 (Fed. Cir. 1987) (internal quotation marks omitted).

For purposes of jurisdiction, there is no further inquiry into whether the allegations of the complaint state a non-frivolous claim on the merits. Jan's Helicopter Serv., 525 F.3d at 1309 (drawing distinction between jurisdiction and merits in the context of a takings claim). Indeed, "[t]he [Supreme] Court [has] made clear that the merits of the claim [are] not pertinent to the jurisdictional inquiry." Jan's Helicopter, 525 F.3d at 1307 (discussing United States v. White Mountain Apache Tribe, 537 U.S. 465, 123 S. Ct. 1126 (2003)). Thus, the actual existence of a contract is not a jurisdictional matter but rather a decision on the merits of the case. See Engage Learning, 660 F.3d at 1355 (addressing jurisdiction over contract dispute under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–7109); Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed. Cir. 1995) (explaining that the trial court must first take jurisdiction before it can determine whether the elements of the alleged contract have been met); Total Med. Mgmt. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997) ("[T]he law is clear that, for the Court of Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven." (citing Spruill, 978 F.2d at 686; Gould, 67 F.3d at 929))).

As noted by the Federal Circuit, "[c]ourts frequently confuse or conflate the distinction between subject matter jurisdiction and the essential elements of a claim for relief." Engage Learning, 660 F.3d at 1353 (citing Arbaugh v. Y & H Corp., 546 U.S. 500, 503, 511, 126 S. Ct. 1235, 1238, 1242 (2006) ("On the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous."); Moden v. United States, 404 F.3d 1335, 1340 (Fed. Cir. 2005)). "Jurisdiction in this context refers to the power of a court to hear and decide a case— subject matter jurisdiction." Gould, 67 F.3d at 929 (citing Spruill, 978 F.2d at 686). "A dismissal for lack of jurisdiction means that the subject-matter of the dispute is one that the court is not empowered to hear and decide." Id. In contrast, "[a] dismissal for failure to state a claim . . . is a decision on the merits which focuses on whether the complaint contains allegations[] that, if proven, are sufficient to entitle a party to relief." Id. "Jurisdiction, therefore, is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." Do-Well Mach. Shop, Inc. v. United States, 870 F.2d 637, 639 (Fed. Cir. 1989) (quoting Bell v. Hood, 327 U.S. 678, 682, 66 S. Ct. 773, 776 (1946)); accord Trauma Serv. Grp., 104 F.3d at 1325; Gould, 67 F.3d at 929.

The Federal Circuit has addressed a number of circumstances in which a merits inquiry has bled inappropriately into a jurisdictional inquiry. See, e.g., Hanlin, 214 F.3d 1320 (reversing dismissal for lack of jurisdiction where plaintiff made non-frivolous allegation of contract implied-in-fact and no other statute divested the Court of Federal Claims of jurisdiction); Trauma Serv. Grp., 104 F.3d at 1324–28 (rejecting the trial court's dismissal for lack of jurisdiction but affirming its decision for failure to state a claim where contract was alleged but could not be shown); Gould, 67 F.3d at 929–30 (finding error in the dismissal of a breach of contract claim for lack of jurisdiction

10

because the complaint's allegation of the existence of an express contract was sufficient to confer jurisdiction even where the contract was alleged to be a statutory violation).

In Brach v. United States, for example, the Court of Federal Claims dismissed a taxpayer's breach of contract action against the Internal Revenue Service (IRS) for lack of jurisdiction on the ground that the taxpayer failed to establish the existence of a contract, but the Federal Circuit held that the trial court possessed jurisdiction over the case based on the plaintiff's allegation of a contract. 98 Fed. Cl. 60, 65 & n.10, 69–70 (2011), aff'd on other grounds, 443 F. App'x 543, 546 (Fed. Cir. 2011). Jurisdiction existed notwithstanding the Federal Circuit's concurrence with the trial court that no contract to pay out a tax refund actually existed because the improper government forms were used and the IRS agents lacked the requisite authority to contract. 443 F. App'x at 547–48. Such facts did not divest the court of jurisdiction, but rather warranted dismissal of the action for failure to state a claim. Id. at 549.

Similarly, in Engage Learning, the Federal Circuit found that the Civilian Board of Contract Appeals erred in holding it lacked jurisdiction under the CDA because Engage failed to establish it had a contract with the government for unpaid services. 660 F.3d at 1349, 1353. Engage was not required to prove it had either an express or an implied-in-fact contract to establish jurisdiction. Id. at 1353 (applying Tucker Act, 28 U.S.C. § 1491(a), jurisprudence). Rather, it need only have asserted a "non-frivolous allegation of a contract with the government." Id. Thus, even though Engage failed to plead all of the requisite conditions for the formation of a contract in that case, the Board should have recognized it was not divested of jurisdiction over Engage's claim. Id. at 1354–56. Accordingly, the Board was directed on remand to accept jurisdiction and only thereafter to review the merits (dismissing on the latter grounds, if appropriate). Id. at 1356.

Here, Mendez puts forth non-frivolous allegations of an express or implied-in-fact contract with the government, see Compl. ¶¶ 2–26, 29–37, asserting with specificity material terms of the alleged agreement and surrounding facts and circumstances. "[T]he requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs." Hanlin, 316 F.3d at 1328; accord Russell Corp. v. United States, 537 F.2d 474, 482 (Ct. Cl. 1976); Thermalon Indus. v. United States, 34 Fed. Cl. 411, 414 (1995). The party must show a mutual intent to contract including offer, acceptance, and consideration. City of El Centro, 922 F.2d at 820; see also Trauma Serv. Grp., 104 F.3d at 1325; Thermalon, 34 Fed. Cl. at 414; Fincke v. United States, 675 F.2d 289, 295 (Ct. Cl. 1982). A contract with the United States also requires that the government representative who entered or ratified the agreement had actual authority to bind the United States. Trauma Serv. Grp., 104 F.3d at 1325; City of El Centro, 922 F.2d at 820; see also Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1432 (Fed. Cir. 1998) ("It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority." (citing, e.g., Fed. Crop. Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S. Ct. 1, 3 (1947))).

Mendez avers each of the elements for the formation of contract.  See discussion supra Part I.  In brief, his contract allegations center upon an alleged meeting of the minds at a 1998 in-person meeting with government officials at the Miami U.S. Attorney's Office and through conduct thereafter over the course of nine years.  See Compl. ¶ 9; O'Bannon Mem. 1.  Mendez allegedly agreed to serve as a confidential informant (and grand jury witness, if necessary) against Battle and his associates.  Compl. ¶¶ 8–9; cf. O'Bannon Mem. 1.  In exchange, Mendez would recover from the government an amount at least equivalent to the back pay, fees, expenses, and costs, he unsuccessfully sought to recover in employment litigation against Battle.  See Compl. ¶¶ 4, 8.  Mendez also presents a plausible explanation for why the alleged verbal agreement or, alternatively, implied-in-fact agreement, was never reduced to a formal writing signed by the parties.  Id. ¶¶ 11–12; see also Tr. 32:11–25.  In addition, even if the contract was not express, it was implied-in-fact as allegedly manifested in the parties' conduct over the ensuing nine years.  E.g., id. ¶¶ 11, 13, 19–23, 25; see generally O'Bannon Mem.  He further alleges that the individuals with whom he dealt had authority and/or that their agreements were ratified by supervisory individuals with the requisite authority.  See Pl.'s Opp'n 2, 10, 20–23; Tr. 27:23–25, 31:19–32:25, 40:22–42:6; see also Compl. Ex. A (Spittler Letter, Mar. 18, 1998).

In support of his allegations, Mendez also attaches to his complaint contemporaneous communications from Attorney Spittler and Attorney Read to government officials, which were sent periodically over the course of nine years purporting to memorialize material terms (although they seemingly went unanswered by the government).  See Compl. at Exs. A, E–F, H.  Mendez also attaches to his complaint his own affidavit, a narrative from his attorney, and an internal DSS draft memorandum authored by SSA O'Bannon, all of which generally corroborate his allegations.  Id. at Exs. B, D, J.  Moreover, there can be no dispute that Mendez alleges money damages, id. ("wherefore" clause), and that, if successful in his suit, money damages would be the appropriate remedy, see Holmes, 657 F.3d at 1314 (explaining money damages are presumed in breach of contract suits).  Regardless of the ultimate veracity or sufficiency of these allegations, a "non-frivolous" allegation of express or implied contract clearly "underlies" Mendez's claim, and that is all that is required to confer jurisdiction on this court.  See Engage Learning, 660 F.3d at 1353; Trauma Serv. Grp., 104 F.3d at 1325.

The government argues that Mendez's allegations are insufficient, refuted by the very evidence on which he relies, incorrect, and/or "implausible" and "unpersuasive."  Def.'s Mot. 3, 18–20.  But, these challenges go to whether Mendez has stated a claim and the ultimate validity and enforceability of the contract.  See Trauma Serv. Grp., 104 F.3d at 1325–28 (affirming dismissal for failure to state a claim based on insufficient evidence of breach); Henke, 43 Fed. Cl. at 25–26 (granting defendant summary judgment based, inter alia, on plaintiff's failure to adduce sufficient evidence that alleged discussions amounted to a mutual intent to contract or assent to plaintiff's understanding).

Likewise, although the government argues that AUSAs and field agents lack the requisite authority to contract under the common law, Def.'s Mot. 20–24, such challenges to authority weigh not against jurisdiction but against whether a plaintiff has stated a claim upon which this court may grant relief. E.g., Jumah v. United States, No. 2010-5076, 385 F. App'x 987, 988–90 (Fed. Cir. Jul. 9, 2010), aff'g, 90 Fed. Cl. 603, 608–14 (2009) (exercising jurisdiction over a breach of contract claim, but dismissing it under Rule 12(b)(6) where plaintiff, a confidential informant, failed to allege facts demonstrating the existence of an oral contract, including a plausible claim that the government representative with whom he dealt had authority); Krupnick v. United States, No. 07-367 CQ, 2008 WL 1709022, at *5, *8 (Fed. Cl. Apr. 9, 2008) (exercising jurisdiction over plaintiff's allegation of the government's promise to pay plaintiff a specific reward of fifteen percent, but then granting dismissal for failure to state a claim, considered under summary judgment standards, based on the lack of an allegation and the lack of evidence that the government representative had actual authority to bind the United States to agreement); McAfee v. United States, 46 Fed. Cl. 428, 431–32, 434–38 (2000) (exercising jurisdiction over a breach of contract allegation but ultimately dismissing it for failure to state a claim where plaintiff could not establish that the government representative who allegedly entered the agreement was authorized to bind the United States).

Alternatively, such challenges may be resolved on summary judgment. E.g., Doe v. United States, 100 F.3d 1576, 1578–79, 1584–85 (Fed. Cir. 1996) (affirming, in relevant part, the trial court's grant of summary judgment to defendant on a breach of contract claim where the informant failed to raise a material fact issue as to the government representative's lack of actual authority to promise reward); JEM Transp., Inc. v. United States, 120 Fed. Cl. 189, 191 (2015) (exercising jurisdiction over a breach of contract claim arising from an alleged contract extension, but granting summary judgment to defendant based on undisputed facts that the alleged extension was never signed or approved by an individual with authority to bind the government); Cornejo-Ortega v. United States, 61 Fed. Cl. 371, 374–76 (2004) (granting defendant summary judgment where the informant failed to show that any of the parties with whom he dealt had authority to enter into a reward contract of the sort he alleged); Warr, 46 Fed. Cl. at 350–52 (finding jurisdiction over an alleged breach of oral agreement but then converting a motion for failure to state a claim to one for summary judgment and finding in defendant's favor that the alleged oral agreement did not exist because plaintiff could not establish the government's obligation to pay); Henke v. United States, 43 Fed. Cl. 15, 25–28 (1999) (granting summary judgment to defendant on plaintiff's breach of oral contract claim where evidence was insufficient to establish an express or implied contract with the government agency and, even if the purported agreement existed, the government agent did not have authority to approve the agreement and the plaintiff failed to show ratification).

Such challenges to authority also have been resolved after trial.  E.g., Leonardo v. United States, 63 Fed. Cl. 552, 579 (2005) (entering judgment for defendant on plaintiff's breach of contract claim based on lack of evidence adduced at trial to establish a "'meeting of the minds' between plaintiff and a person with authority to bind the government on the terms of plaintiff's alleged [] bailment contract").  In any event, based on the foregoing, a government representative's authority to bind the government plainly bears—as a matter of common law—upon the validity of a purported agreement and is not a basis for divesting this court of its jurisdiction over such an agreement.

Nor do the forfeiture statutes relied upon by the government, see Def.'s Mot. 23 (discussing the Department of the Treasury Forfeiture Fund, 31 U.S.C. § 9703, and the Department of Justice Assets Forfeiture Fund, 28 U.S.C. § 524(c)), somehow displace or preempt this court's jurisdiction over an alleged contract with the government.

Section 9703, and authority interpreting it, confirms that the Treasury Forfeiture Fund may be used for law enforcement purposes including, in relevant part, compensation for informants; for information or assistance leading to forfeitures or relating to a money laundering violation; or for reimbursing private persons for expenses incurred assisting the government.  See 31 U.S.C. § 9703(a)(2); United States v. $133,735.30 Seized from U.S. Bancorp Brokerage Account No. 32130630, 139 F.3d 729, 730–31 (9th Cir. 1998); United States v. Cuellar, 96 F.3d 1179, 1185–86 (9th Cir. 1996) (Wiggins, J., concurring).  The same is true for the use of assets under the Assets Forfeiture Fund.  See 28 U.S.C. § 524(c); Perri v. United States, 340 F.3d 1337, 1340–43 (Fed. Cir. 2003); Doe v. United States, 58 Fed. Cl. 479, 481–83 (2003).  However, while both statutes are money-authorizing, any compensation that either entity actually pays out is subject to the discretion of the secretary at each entity.  28 U.S.C. § 524(c)(1)(A), (C); 31 U.S.C. § 9703(2).  Accordingly, authorities confirm section 524(c) is not money-mandating and therefore cannot be a source of jurisdiction for this court.  Perri, 340 F.3d at 1340–43 (discussing 28 U.S.C. § 524(c)); Doe, 58 Fed. Cl. at 481–82 (same); see also Aboo v. United States, 86 Fed. Cl. 618, 626 (2009), aff'd, 347 F. App'x 581 (Fed. Cir. 2009) ("Because the asset forfeiture statute [28 U.S.C. § 524(c)] gives the Attorney General or his delegate the discretion to determine whether to make a compensatory award, the statute cannot appropriately be interpreted as being money-mandating.") (citing Perri, 240 F.3d at 1342).  By logical extension, the same would be true for section 9703, although no reported opinions appear to have addressed the issue specifically.  Here, therefore, defendant is correct that jurisdiction would be lacking to the extent Mendez asserts a right to compensation under either statute.

However, to the extent Mendez alleges the government inadequately pursued or frustrated Mendez's opportunity for compensation under these statutes in breach of the

alleged 1998 agreement or the implied duty of good faith and fair dealing,[5] the forfeiture statutes do not affect this court's jurisdiction over Mendez's breach claims. Likewise, to the extent the government relies on either statute to render void or voidable any purported agreement between Mendez and the government, then such challenges are to the merits of Mendez's breach claim and are not a basis for divesting or preempting this court's jurisdiction over an alleged contract. See U.S. Home Corp., 92 Fed. Cl. at 409 (explaining that "several precedential decisions [exist that have] affirmed this court's Tucker Act jurisdiction over contract claims, despite the fact that the subject matter of the contracts at issue might otherwise have been governed by statutory schemes under which claims could not be litigated in this court" (citing, e.g., California v. United States, 271 F.3d 1377, 1383 (Fed. Cir. 2001) (affirming this court's jurisdiction over a breach of contract claim, because no "unambiguous evidence in the text or legislative history of [the Flood Control Act of 1928, 33 U.S.C. § 702c (2006) showed] that Congress had 'withdrawn the Tucker Act grant of jurisdiction'"))); see also Salles v. United States, 156 F.3d 1383, 1383–84 (Fed. Cir. 1988) (per curiam) (affirming the trial court's summary judgment dismissing a confidential informant's breach claim based on a finding that the government officials' authority to contract was "limited by . . . 28 U.S.C. § 524(c), which does not authorize payment promises providing for a percentage of all seizures, as alleged"); cf. Gould, 67 F.3d at 929 (holding that the court was not divested of jurisdiction over a contract based on an allegation that the contract was illegal because the court "must first take jurisdiction over the case before it decides whether an illegality . . . [is a] proper basis . . . [for] dismissal . . . [for] failure to state a claim"); U.S. Home Corp., 92 Fed. Cl. at 407–10 (holding that a breach claim based on deed covenants was not jurisdictionally displaced or preempted by an environmental statute).

In sum, Mendez's complaint presents well-pleaded, non-frivolous allegations of a contract that underlies his breach claims; these allegations are sufficient to confer jurisdiction on this court under 28 U.S.C. § 1491(a)(1).

---

[5]     "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Metcalf Const. Co. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014) (citing Restatement (Second) of Contracts § 205 (1981) (Restatement), quoted in Alabama v. North Carolina, 560 U.S. 330, 130 S. Ct. 2295, 2312 (2010)). "Failure to fulfill that duty constitutes a breach of contract, as does failure to fulfill a duty 'imposed by a promise stated in the agreement.'" Id. (quoting Restatement § 235). The Federal Circuit "[has] long applied those principles to contracts with the federal government." Id. (citing, e.g., Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 828 (Fed. Cir. 2010); Malone v. United States, 849 F.2d 1441, 1445–46 (Fed. Cir. 1988)).

B.      Mendez's Claims Are Not Time-Barred Under 28 U.S.C. § 2501

Although Mendez's well-pleaded allegations of contract confer jurisdiction on this court, the court can only exercise that jurisdiction if Mendez's breach claims accrued within the court's statute of limitations.  Claims against the United States must be "filed within six years after such claim first accrues."  28 U.S.C. § 2501 (2012); see John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133–35 (2008) (providing that the six-year limitations period is an "absolute" limit on the ability of the Court of Federal Claims to reach the merits of a dispute); FloorPro, Inc. v. United States, 680 F.3d 1377, 1381 (Fed. Cir. 2012) (holding that the limitations period imposed by section 2501 is "jurisdictional, and may not be waived or tolled").  "A claim accrues 'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'"  Patton, 64 Fed. Cl. at 774 (quoting Kinsey v. United States, 852 F.2d 556, 557 (Fed. Cir. 1988)).  "Claims for breach of contract generally accrue at the time of the breach."  Id. (citing Brighton Vill. Assocs. v. United States, 52 F.3d 1056, 1060 (Fed. Cir. 1995)).  "A claim does not accrue, however, 'unless the claimant knew or should have known that the claim existed.'"[6]  Id. (quoting Kinsey, 852 F.2d at 557 n.*); see also Banks v. United States, 741 F.3d 1268, 1279–80 (Fed. Cir. 2014) ("The accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed ('the accrual suspension rule')."  "Alternatively, '[a] claim accrues when damages are ascertainable.'"  Patton, 64 Fed. Cl. at 774 (quoting Shermco Indus., Inc. v. United States, 6 Cl. Ct. 588, 591 (1984)).

Mendez filed his complaint on June 10, 2014; thus, his breach of contract and good faith and fair dealing claims must have accrued, if at all, no earlier than June 10, 2008 (six years prior).  The government asserts that Mendez's claims accrued, if at all, in either 2004 or 2007 and thus, are barred by limitations.  Def.'s Mot. 16–17.  In support of its position, the government points to Attorney Read's March 2004 threat to AUSA Lehr that Mendez was "prepared to file an equitable lien," as well as the February 2007 filing of a Notice of Lien in Battle, as evidence that Mendez knew at those times that the government did not consider itself obligated to pay Mendez any compensation.  Id. at 17. Alternatively, the government contends that Mendez had to know of the government's

---

[6]      "For the accrual suspension rule to apply, the claimant 'must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date.'"  Banks v. United States, 741 F.3d 1268, 1280 (Fed. Cir. 2014) (quoting Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (quoting Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc))); see also Patton v. United States, 64 Fed. Cl. 768, 776 (2005) (holding that these conditional exceptions are met "only where [a plaintiff's] due diligence would not have prompted discovery" at an earlier date).

opposition to payment when the government filed its Motion to Strike the Notice of Lien on April 5, 2007.  See Tr. 9:5–10:4.

Mendez responds that "[i]t is axiomatic that, in order for a breach of contract claim to accrue, there must first be a breach."  Pl.'s Opp'n 11 (citation omitted).  Thus, according to Mendez, "the date when [his] claim first accrue[d], [would be] the date the Government first denie[d] the claim for payment."  Id. (citations omitted).  In this case, Mendez contends, that date was "May 8, 2013, when [Attorney Spittler] received a letter from the U.S. Department of Justice stating that Mendez's Petition [for Remission] to the U.S. Attorney General was denied."  Id. at 12; see also Def.'s Mot. at Ex. 8 (DOJ Letter, May 8, 2013) (denying Petition for Remission).  Government resistance prior to 2013 allegedly had more to do with objecting to the method Mendez was taking to recover the money (e.g., the equitable lien in Battle) than any aversion to honoring the parties' alleged 1998 agreement.  See Pl.'s Opp'n 12–13.  Indeed, after the 2008 denial of Mendez's equitable lien, the government allegedly provided Mendez with "substantial encouragement and assistance" in his preparation and filing of the Petition for Remission with the Attorney General, up to and including providing him with necessary forms in 2012.  Id. at 13–15.  This support is evidenced in SSA O'Bannon's internal DSS memorandum, as well as SSA O'Bannon's affidavit filed in this case.  Id. at 14.

Based on the record presently before the court, the court finds that the statute of limitations began to run on or about January 14, 2010, when the final judicial order of forfeiture was entered.  See Def.'s Mot. at Ex. 2 (Forfeiture Orders); Tr. 16:9–20 (explaining significance of the 2010 final order of forfeiture).  The preponderance of the evidence suggests that, about that time or shortly thereafter, Mendez's alleged right to compensation out of the forfeitures ripened, Mendez "knew or should have known that [his] claim [for compensation] existed," see Kinsey, 852 F.2d at 557 n.*, and his "damages [were] ascertainable," see Shermco Indus., 6 Cl. Ct. at 591.  Counsel for Mendez conceded as much at oral argument.  Tr. 29:16–21, 38:9–21.  Counsel for the government effectively did as well.  See Tr. 53:20–54:11.  Thus, based on this finding, the court concludes at present that Mendez's complaint lodged roughly four-and-a-half years later, on June 10, 2014, was filed within the court's six-year statute of limitations.  However, the court does not discount the possibility that the weight of the evidence will shift if subsequent discovery reveals, inter alia, that Mendez's right to payment accrued earlier or that he knew or should have known earlier that the government would not honor the allege agreement; alternatively, discovery also might reveal that the government had been concealing its intention to disclaim the alleged agreement, such that the doctrine of accrual suspension might apply to extend the limitations period.  The parties are forewarned, therefore, that the court may revisit the limitations issue at a later date if the evidence so warrants.  See Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004) ("Subject-matter jurisdiction may be challenged at any time by the parties or by the court sua sponte." (citing Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))).

IV.     The Rule 12(b)(6) Motion Is Deferred for Consideration Under Rule 56

Having found that the court may exercise jurisdiction over Mendez's breach claims, the government urges dismissal of those breach claims on the alternate theory that Mendez fails to state claims upon which this court may grant relief.[7]  Def.'s Mot. 1, 24–25 (invoking Rule 12(b)(6)).

The government's arguments under Rule 12(b)(6) are essentially the same as its arguments under Rule 12(b)(1)—namely, there can be no breach of contract where there never existed a contract in the first instance.  The government contends, specifically, that Mendez's allegations are insufficient and implausible based on the lack of evidence of mutuality of intent.  Id. at 17–20, 24.  Furthermore, even if government representatives made the alleged promises, such promises purportedly are invalid and/or unenforceable because the representatives lacked express or implied actual authority to bind the government to pay Mendez for his services.  Id. at 20–25.  Alternatively, the government representatives were divested of authority by the RICO statute, 18 U.S.C. § 1963(g), and the statutes governing the Treasury Forfeiture Fund, 31 U.S.C. § 9703, and the DOJ Assets Forfeiture Fund, 28 U.S.C. § 524(c), id. at 22–23, which vest sole discretion to compromise forfeiture assets and/or to reward informants with the Attorney General and the heads of the relevant agencies, respectively, see supra Part III.  In support of its position, the government attaches to its motion copies of a myriad of documents evidencing Mendez's efforts to collect on the government's alleged promise to pay compensation and the reasons those efforts were unsuccessful.  See Def.'s Mot. at Exs. 1–8.  The government also attaches to its reply brief copies of a government Memorandum filed in Battle discussing contract issues, Def.'s Reply, ECF No. 21, at Ex. 9, as well as a DOJ handbook entitled "The Attorney General's Guidelines on Seized and Forfeited property," dated July 1990 and marked amended November 2005, id. at Ex. 10.

Mendez responds that "[t]he evidence of a mutuality of intent and interest in entering into an implied-in-fact contract is extensive and unambiguous."  Pl.'s Opp'n 16.  For example, Mendez avers that Attorney Spittler's 1998 letter to AUSA Lehner is not evidence of on-going negotiations, as argued by the government, but rather is an attempt to memorialize a verbal agreement and arrange for its reduction to a formal writing.  Id. at 19–20.  In addition, "[f]ar from the 'silence' that the Government claims was its only response to plaintiff's representations regarding the existence of an oral agreement, the

---

[7]     In order to state a claim for breach of contract, Mendez must allege: (1) a valid contract between the parties (i.e., mutuality of intent evidenced by offer, acceptance, and consideration, as well as requisite authority); (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach.  See Trauma Serv. Grp., 104 F.3d at 1325 (elements of valid contract with the government); San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989) (elements of breach).

Government repeatedly assured Mendez and his attorney that there was, in fact, an oral agreement regarding Mendez's compensation, and that the Government intended to honor that agreement." Id. at 16 (internal citation omitted); see also id. at 20–23.  Furthermore, "the Government readily agreed to the insertion of a handwritten addition to the standard immunity agreement with the U.S. Attorney's Office which specifically acknowledged [the existence of the 1998 restitution agreement]." Id. at 21.  In addition, Mendez contends that AUSA Lehner or others did have implied actual authority.  See id. at 23.  In support of his opposition to dismissal, Mendez provided as exhibits to his briefing substantive affidavits from himself, SSA O'Bannon, and Attorney Spittler, as well as various documents that were attached as exhibits to the furnished affidavits.  See Mendez Aff., Dec. 11, 2014, ECF No. 18-1 (Mendez Second Aff.); O'Bannon Aff., Dec. 5, 2014, ECF No. 18-2; Spittler Aff., Dec. 19, 2014, ECF No. 18-3.

        The problem for the court is that the parties rely extensively on the contents of the exhibits and affidavits appended to their briefing to support their Rule 12(b)(6) arguments, such that the court cannot consider the merits of their arguments without considering the affidavits and documents themselves.  Of particular interest to the court are the affidavits attached to Mendez's opposition brief and the DOJ handbook attached to the government's reply brief.  In any event, all of these materials attached to the briefing are outside the pleadings.  Thus, the court must convert the government's Rule 12(b)(6) motion to dismiss for failure to state a claim to a motion for summary judgment. See RCFC 12(d) ("If, on a motion under RCFC 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56.").  In Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc., for example, the Federal Circuit vacated a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) where the trial court had considered materials outside the pleadings, because in those circumstances "the rules governing summary judgment must apply."  988 F.2d 1157, 1164 (Fed. Cir. 1993); accord U.S. Home Corp., 92 Fed. Cl. at 407 (converting a motion where both the plaintiff and the defendant appended materials to their briefing that were integrally related to the merits of their arguments for and against dismissal); Krupnick, No. 07-367 CQ, 2008 WL 1709022, at *1, *7–8 (Fed. Cl. Apr. 9, 2008) (converting a motion and finding in favor of defendant based on the lack of evidence of requisite authority); Cornejo-Ortega, 61 Fed. Cl. at 372–76 (granting judgment to defendant on a motion to dismiss converted to summary judgment based on the lack of evidence that the parties with whom plaintiff had dealt possessed the requisite authority to bind the government to pay an informant under a purported reward contract); Warr, 46 Fed. Cl. at 350–52 (converting a motion and finding for defendant on summary judgment that no oral contract existed).

        Challenges to a government representative's authority to contract are commonly addressed on summary judgment.  See Salles, 156 F.3d at 1383–84 (affirming trial court's summary judgment, which found that the confidential informant failed to adduce evidence of requisite authority to support the allegation of an oral contract with the

government for the payment of a percentage of the value of seizures and forfeitures that the informant helped the government obtain); <u>Bailey v. United States</u>, 40 Fed. Cl. 449, 469 (1998) (explaining that, in the record before the court on a motion to dismiss, there was "insufficient evidence" to determine (i) at what level the discussions occurred between the parties, which resulted in plaintiff providing certain information based on the belief he would be paid; and (ii) whether someone with the requisite authority approved the arrangement that the plaintiff claimed resulted in the alleged contract); <u>see also</u> <u>Sommers Oil Co. v. United States</u>, 241 F.3d 1375, 1379–81 (Fed. Cir. 2001) (finding the complaint was sufficient to state a claim for breach of contract by the government and remanding for a determination on the merits whether any government official was actually authorized to make a promise to pay the plaintiff-informant and what regulatory or statutory provision authorized the official to do so); <u>cf.</u> <u>Harbert</u>, 142 F.3d at 1430 (Fed. Cir. 1998) (affirming in part, and reversing in part, the Court of Federal Claims' post-trial fact-intensive findings on authority and ratification relating to an alleged oral contract).

Furthermore, in converting the motion, the court must provide the parties with an opportunity to litigate the government's Rule 12(b)(6) challenge through the procedures afforded by Rule 56.  <u>See</u> RCFC 12(d) ("All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."); <u>see also</u> <u>Levy v. United States</u>, 10 Cl. Ct. 602, 605–06 (1986) (allowing the parties in a real estate sale breach of contract suit to supplement initial briefing on a motion to dismiss, to which defendant had attached exhibits related to the real estate sale, with "additional legal argument and materials in support of, or opposition to, summary judgment"); <u>cf.</u> <u>Gary v. United States</u>, 67 Fed. Cl. 202, 204, 218 (2005) (granting a motion to dismiss for lack of jurisdiction based on the plaintiff's failure to adduce evidence in support of actual authority or ratification after the court permitted discovery on the issue of whether a contract existed between them).  For these reasons, the court reserves the government's Rule 12(b)(6) challenge to the complaint for further proceedings.

V.      Conclusion

Mendez has agreed to dismiss voluntarily Count I (declaratory judgment) and Counts IV through VII (unjust enrichment, promissory estoppel, equitable lien, and fraud).  With respect to remaining Counts II and III, alleging breach of express or implied-in-fact contract and breach of the implied duty of good faith and fair dealing, this court has jurisdiction for the reasons set forth in Part III, <u>supra</u>.  Further, the court converts the government's Rule 12(b)(6) challenge to Counts II and III to a motion for summary judgment for the reasons set forth in Part IV, <u>supra</u>.

Accordingly, it is hereby **ORDERED** that

(1) The Clerk's office is directed to **DISMISS** Count I and Counts IV through VII of the Complaint pursuant to Rule 41(a)(2), without prejudice;

(2) Defendant's Motion to Dismiss, filed November 5, 2014, is **DENIED in part** and **CONVERTED in part** to a summary judgment motion, as follows:

    (a) Defendant's Rule 12(b)(1) and 12(b)(6) challenges to Count I and Counts IV through VII of the Complaint are **DENIED** as moot in light of plaintiff's voluntary dismissal of those counts;

    (b) Defendant's Rule 12(b)(1) challenge to Counts II and III is **DENIED**;

    (c) Defendant's Rule 12(b)(6) challenge to Counts II and III of the Complaint is **CONVERTED** to a Rule 56 motion for summary judgment and the court **DEFERS** ruling on defendant's summary judgment motion; and

(3) On or before **June 17, 2015**, the parties shall **FILE** a **Joint Status Report** proposing a schedule for further proceedings with respect to discovery and summary judgment and stating the extent to which the parties have determined whether any or all of the claims before the court may be settled.  Settlement negotiations and alternative dispute resolution should be considered as alternatives to litigation.

                             s/ Patricia Campbell-Smith
                             PATRICIA CAMPBELL-SMITH
                             Chief Judge